HEARD APRIL TERM, 1877.

## SHAND *vs.* GAGE.

On a promissory note, which fell due May 18th, 1864, an action was commenced February 3d, 1872: *Held*, That the action was barred by the Statute of Limitations.

The military orders known as Order No. 10 and Order No. 164, issued in 1867, did not have the effect of suspending the operation of the Statute of Limitations of the State.

A Governor's proclamation declaring a corporation dissolved, by forfeiture of its charter, cannot, of itself, have that effect. The fact which caused the forfeiture must first be judicially determined.

## BEFORE MOSES, J., AT UNION, JUNE, 1875.

This was an action by Robert W. Shand as Receiver of the Cotton Planters' Loan Association of the Fifth Congressional District of South Carolina against Columbus Gage. There were six other actions, by the same plaintiff, against as many different defendants, in which the facts and questions raised were the same as in the action above named.

The action was upon a promissory note for $679.97, dated May 18th, 1863, payable twelve months after date, to one W. C. Dunn, and endorsed by the defendant, before maturity, to the Cotton Planters' Loan Association, of which the plaintiff was the Receiver.

The action was commenced by service of the summons February 3d, 1872, and the defendant, amongst other defenses, pleaded the Statute of Limitations of the State.

At the trial the plaintiff gave in evidence a proclamation of Governor Orr, issued September 8th, 1866, whereby he declared the charter of the said Cotton Planters' Loan Association forfeited, upon the ground that the association had not transmitted, through its President and Treasurer, to the Comptroller General of the State the monthly statement as required by its charter. It was also proved, on behalf of the plaintiff, that the association was organized in 1862, and that the organization was kept up until the proclamation of Governor Orr was issued.

The defendant requested His Honor to charge the jury—

1. That the proclamation of Governor Orr did not dissolve the corporation, but that it continued to exist until its charter expired, by its own limitation, on January 1st, 1869.

2. That the military orders known as General Order No. 10, of April 11th, 1867, and as Order No. 164, of December 31st, 1867, did not suspend the operation of the Statute of Limitations.

The request was denied, and the defendant excepted.

His Honor then charged the jury—

1. That Governor Orr's proclamation dissolved the corporation.

2. That the Statute of Limitations of the State was suspended, by the orders above mentioned, until the ratification by the Legislature of the State of the fourteenth amendment of the Constitution of the United States.

3. That the plaintiff's action was not barred by the Statute of Limitations.

The defendant excepted to the charge, and then appealed.

*Steedman,* for appellant.

*Munro, Shand,* contra.

The opinion of the Court was delivered by

WILLARD, C. J.  The seven cases above entitled were heard together and involve the same questions.  Several questions of law are raised by the appeals and have been discussed at bar, but the objection to a recovery presented by the plea of the Statute of Limitations will, if entitled to be sustained finally, dispose of all the matters in controversy and render it unnecessary to consider the other questions discussed.  The several causes of action, which are based upon obligations for the payment of money, arose, as appears by the general statements of the brief, on the 21st of May, 1864. The actions against J. R. Jeter were commenced June 8th, 1872, and all the other actions on or about February 3d, 1872.

The time within which an action was required to be brought after the cause of action arose, in cases of this class, as the law stood at the time the causes of action in question arose, was four years.  The change to six years made by the Code (Section 114) is, according to Section 96, inapplicable to causes of action that arose prior to the adoption of the Code.  The present causes of action being of the latter class, the former law is applicable to them, and the objection that the actions were not brought within four years next after such causes of action arose, if properly sustained, must lead to a dismissal of the complaint.  In computing the lapse of time, the period during which the operation of the Statute of Limitations was suspended under the Act of 1861 and the annual Acts continuing it in force will be excluded (*Wardlaw* vs. *Buzzard,* 15 Rich., 158,) as presenting the plaintiff's case most favorably.  The

suspension of the statute lasted just five years, from December 21, 1861, to December 21, 1866.—*Harlee* vs. *Ward*, 15 Rich., 231. We need not consider whether, under the Act of 1861 as affected by the yearly renewals, the plaintiff's causes of action were such as to enjoy the suspension of the Statute of Limitations, unless we find ourselves compelled to conclude that a cause of action arising December 21st, 1866,—the termination of the stay law—would not have become barred at the time the present actions were commenced.

From December 21st, 1866, to the date of the commencement of the actions under consideration was a period of more than four years. Unless, then, the plaintiff can show that a portion of this time, sufficient to reduce it within four years, ought not to be counted against him, the statute is a bar. This the plaintiff has attempted to do by pleading an order made by an officer of the United States, in military command within the territory of the States of North and South Carolina, under the authority of an Act of Congress, and by the appointment of the President of the United States, and with powers conferred and limited by the provisions of an Act of Congress popularly known as the first Act of reconstruction. On the day last mentioned, the military commander promulgated a general order, known as General Order No. 10, containing the following paragraph:

" Proceedings in such causes of action (*i. e.*, arising between the 19th of December, 1860, and the 15th of May, 1865,) shall be stayed, and no suit or process shall be hereafter instituted or commenced for any such causes of action."

This order, made by Major General Sickles, was afterwards, by Order No. 164 of December 31st, 1867, made by General Canby, who had succeeded General Sickles in such command, modified as follows:

" Proceedings for such causes of action now pending shall be stayed, and no suit or process shall be instituted or commenced in such causes of action until after the civil government of the respective States be established in accordance with the laws of the United States."

Two inquiries arise from the consideration of this order, first as to its nature, and next as to its effect, if any, upon the currency of Statute of Limitations. The orders in question did not proceed from or derive force under the laws of this State, but emanated

from a source of authority for the time being impugning those laws. The essential object of the order was to prevent for a limited time an appeal to the laws of the State for certain remedies by action at law. The force that thus intervened acted externally to the laws of the State, and was exercised in the name of the United States government; and if a rightful exercise of public authority must be regarded as having proceeded from the Constitution and laws of the United States wholly, we have to consider the nature of the Act assumed as one of rightful public authority, and its effect, if any, upon the operation of the Statute of Limitations. The nature of the general powers of the military commanders, as conferred by the Acts of reconstruction, was considered in *Raymond* vs. *Thomas*, (91 U. S., 712). In that case, decided by this Court, (4 S. C., 347,) and affirmed by the Supreme Court of the United States, the question was as to the effect of an order made by the military commander, whose powers are now under consideration, assuming to vacate and set aside a final judgment of the Court of Chancery of this State. This Court did not find it necessary to call in question in that case the authority of the military commander, as we found what was regarded as a fatal defect through the failure of the order to describe the judgment upon which it was supposed to act. On appeal, the Supreme Court of the United States did not hesitate to call in question the authority of the military commander to issue such order.

There are several noticeable features in the opinion of the Court that help to an understanding of the true bearing of the judgment of that Court. In the first place the date of the restoration of nominal relations between the State of South Carolina and the United States is fixed at July 11th, 1865, though it is not definitely indicated as the intention of the Court to hold that at that date there was such a full and final exercise of the power of establishing conditions of peace on the part of Congress that the special authority and jurisdiction of that body, resulting from the existence of the State of war, had absolutely ceased at that day. Under the view taken of that case by that Court it was not necessary to announce such a conclusion, which would have been necessary had the case turned on the validity of the Acts of Congress under which the military commander derived his authority, for the ultimate conclusion of the Court was that the Acts of Congress did

not warrant the exercise of such authority as had been asserted by the military commander in question.

It may be fairly concluded, however, that from and after the 11th day of July, 1865, the commanding officer of the military forces of the United States within this State did not possess those general. powers, arising from the laws of war, that result when a a belligerent force occupies conquered territory. Should it be made to appear that the military orders in question in the present case cannot have the force and effect contended for under the authority of the Acts of Congress prescribing the powers of the officers from whom they emanated, then it will not be necessary for this Court to pass upon the authority of Congress to enact these laws, for the same reason that deterred the Supreme Court of the United States from entering upon that question.

It is necessary, however, to form some conclusion as to the nature and extent of the authority intended to be conferred by Congress on the military commanders in question, in order to determine the nature of the military action in question. In deducing such intent from the language of the Acts of Congress, the constitutional limits of the authority of Congress must be held in view as those limits are defined by the Supreme Court of the United States. As that Court has held that the general effects and consequences of the state of war ceased on the 11th of July, 1865, prior to the passage of the Acts of reconstruction, it must be assumed that Congress did not intend to perpetuate in the military commanders, after that date, authority that could not constitutionally be exercised except as one of the effects and consequences of an existing state of war. Active hostilities having ceased, and the power of pacification having been fully exercised at the date last mentioned, according to the decision of the Supreme Court, as interpreted by the opinion of the Court, we can see no other explanation of the purpose of Congress than such as might result from a conviction, on the part of that body, that it was constitutionally responsible for the preservation of a state of domestic peace in the States embraced in their action until State authority should be so fully rehabilitated as to be sufficient for the accomplishment of that end. This would seem to imply a claim of right to exercise police powers, having in view the preservation of the peace and the protection and security of persons and property connected with the national administration, civil and military. Whatever authority Congress may have possessed to

control the rehabilitation of the States by provisions limiting the voluntary action of the political powers of the State may well be regarded as superadded to the powers last defined without materially affecting the nature of those powers. We are not called upon to define the limits of the authority of Congress as affecting the formation of the organic law of the State, but refer to the subject for the purpose merely of indicating the independence of the two classes of powers, in their nature and objects such that the incidents of the one are not necessarily modified by the other. The exercise of police power is not necessarily confined to the arrest and detention of offenders and disposing of unlawful assemblies, but often goes to the extent of interference to prevent unoffending citizens from exercising their strictly legal rights. Ordinary illustrations of this class are abundant. It is exercised by preventing citizens from performing acts otherwise lawful, where, in times of public danger, such acts may occasion unintentional injury to the community. Such interferences frequently take place when the community is threatened by civil commotion, conflagration or contagious disease. To what extent such powers are capable of being enlarged in order to keep pace with all the forms of common peril to which the body politic is exposed cannot be distinctly defined, for they result from a principle applying itself to ever-varying circumstances rather than to a rule of statutory or customary law. Such powers are clearly distinguishable from those that result from the existence of a state of war in the hands of the commander of a military force.

To gain a clear view of the effect of the decision of the Supreme Court in the case under consideration, it is important to keep this distinction in view: where martial law prevails, except where its scope and effect is limited by the supreme authority of the State, to which those who exercise military authority as well as those who exercise civil authority are subject, the functions of the civil government are for the time being completely displaced, or, what is equivalent, subordinated to the military authority. The action of every public body or functionary not possessing the right to control the military authority is subordinated. This would embrace the Legislature of a State in which martial law prevails by the authority of Congress and is enforced by the military power of the United States. It would also embrace the action of the Courts exercising civil authority alone. When authority of that class exists and the

military commander assumes to nullify the decree of a Court, during the continuation of martial law, such act would be efficacious, whatever might be its effect after the restoration of civil authority. A Court passing upon such an act, after the restoration of civil authority, could not pronounce it void *ab initio*.

It is inferable, therefore, from the result to which the Supreme Court of the United States arrived in the case under consideration, as well as from the statement of the ground of such conclusion, that it did not recognize the military commanders of this State after 11th July, 1865, as possessed of such powers as are conferred on such commanders by the existence of martial law or the right of conquest.

Upon the further examination of that opinion, it appears to us that ground appears for the conclusion that it was the intent of Congress to confer merely enlarged police powers upon the officer placed in command under the Acts of reconstruction as affecting the persons and property of private citizens.

Justice Swayne, in commenting upon the act of the military commander, observes that "it is not an order for mere delay. It did not prescribe that the proceeding should stop until credit and confidence were restored and business should resume its wonted channel." These expressions are consistent with the idea that the powers of the commanders were in the nature of police powers and clearly imply the absence of any power to create changes in the statutory or customary law of the places under their military jurisdiction. They imply, at the most, a temporary authority to deprive the citizen of the benefit of the local laws for a limited time, not by changing the abstract operation and effect of those laws, but, by the application of force to his person, to prevent him from asserting certain rights and privileges conferred upon him by law, an exercise of authority that could not be justified, from whatever source it may have proceeded, except where an extraordinary emergency exists involving the safety of the community. We think that this definition of the nature of the powers of the military commanders is also the result of another principle laid down in the opinion under consideration. Justice Swayne says "it is an unbending rule of law that the exercise of military power, where the rights of the citizen are concerned, shall never be pushed beyond what the exigency requires." The application of this principle precludes us from construing the Acts of Congress relating to re-

construction as intending more than providing for the peace of the communities to which they related while the process of rehabilitation was taking place.

For the foregoing reasons, we are inclined to hold that, as it regards the operation and effect of the laws of the State, the action of the military commanders is to be regarded as of the nature of enlarged police powers, which in their exercise might temporarily interrupt the laws of the State but could not engraft changes of any kind upon them. It was not competent for the military commanders to create any exception or limitation to the Statute of Limitations that could be recognized in the civil Court during the supremacy of civil law. The utmost effect of the orders in question was, by force acting upon or threatened against the person of the citizen, derived from a source external to the laws of the State, to deter him from pursuing his legal remedies in the Courts of justice.

. The question then presents itself whether an act of interference of this nature, that prevents a citizen from prosecuting his claims within the time prescribed by law for that purpose, operates to extend such time in contravention of the terms of the statute.

It is very clear that only the legislative authority that could create the statute can repeal it in whole or in part or create new exceptions or conditions to it. When, therefore, the sovereign who makes the law does an act the effect of which is to impede the right of the citizen to his remedy, it may well be considered whether or not a repeal or modification of the restrictive part of the statute was not implied in such act of interference. The case just stated is probably the strongest that could be put for introducing constructive exceptions to the Statute of Limitations, and yet, even as it regards that case, the authorities are in great conflict and uncertainty.

The present case is clearly distinguishable from that just stated, inasmuch as the interference with the plaintiff's remedy did not occur through the act of a source of authority competent to enact or modify any State statute, but from a source as independent of the law-making power of the State as if it had been produced by the forces of nature. We can find no precedent or principle that warrants any interference with the Statute of Limitations on any such ground. We have not been able to discover any authority in any case or text writer that would warrant the interpolation in the

statute of such an exception as that implied in the plaintiff's claim in his argument in this case.

While the case is, in its effect, one of hardship, as affecting the plaintiff's right, its remedy is beyond the power of this Court. Wrongs that occur in the intercourse of individuals are usually capable of redress; but there are many deprivations of right that result from inevitable accident that are irremediable as far as the laws are concerned, and among the most fruitful causes of such disasters, wars and domestic revolution may be enumerated. If, in attempting to eliminate the evils that follow in the train of war and civil discord, there is danger that the simplicity and symmetry of the civil law will become impaired, it is better that individuals should suffer these evils than that they should be transferred to the body of the laws and thus propagated through the indefinite future of the community.

It is necessary to notice the defendant's request to charge refused by the Circuit Judge and the charge given in its stead.

The proposition charged was in effect that the Cotton Planters' Loan Association, of which the plaintiff is Receiver, was actually dissolved under the operation of the sixth Section of the Act incorporating it, (13 Stat., 41,) by reason of a proclamation of the Governor of the State in September, A. D. 1866. The substance of the request to charge was that such proclamation could not, under the operation of the charter, effect actual dissolution. The intended effect of this charge, as made, upon the case was that the corporation having become dissolved prior to the period when the Statute of Limitations became operative by the expiration of the Stay Law there was at that time no one who could maintain an action on the causes of action in suit, and that this state of things continued until the appointment of the plaintiff as Receiver of such corporation in September, 1871, and that the Statute of Limitations did not commence to run until such appointment of a Receiver, and, therefore, that the actions were commenced in due time. The proposition involved in the request to charge was that at the expiration of the Stay Law the corporation was competent to sue, and, therefore, the statute commenced to run. If the defendant's proposition was correct, then, under the views of the operation of the statute already expressed, the actions were already barred at the period of their commencement. The question to be considered involves the construction of a portion of the sixth Section of the Act " to charter a

Cotton Planters' Loan Association," passed December 21st, 1861.—13 Stat., 41. The language of this Section involved is as follows : "And the President and Treasurer shall, on the first day of every month, transmit a statement, sworn to by them, showing the amount of cotton on hand, the amount of bills and notes issued and in circulation, and the amount of loans and discounts made by such Association ; and in case such report shall not be made for two consecutive months, as herein required, it shall be the duty of the Comptroller General to report that fact to the Governor, who shall forthwith issue his proclamation declaring the charter of such Association forfeited."

The principles governing the construction of these provisions were stated by this Court in *Ahrens* vs. *The State Bank*, (3 S. C., 401). It was there held that where a statute declares a forfeiture of corporate franchises as the consequence of a failure of legal duty on the part of a corporation, the statute is to be regarded as penal in its nature, and the act of wrong must be judicially ascertained in a direct and proper judicial proceeding before the penal consequences imposed by the statute become operative.

The present case is a stronger one for the application of these principles than the case presented in *Ahrens* vs. *The State Bank*. In that case the statute declared a direct forfeiture in terms in the event that the corporation failed to comply with the particular requirements that were the subject of the statute, (14 Stat., 212,) while in the present case that intent is not in terms declared, though inferable from the directions given to the Governor in that event to issue his proclamation "declaring the charter of such association forfeited." In another aspect the case in hand is stronger for the application of those principles. In the present case the act of public authority claimed to have worked an actual dissolution was that of an executive officer, the Governor, while in the case of *Ahrens* vs. *The State Bank* a judicial act was necessary, namely, the appointment of a Receiver. This Court held in the last named case that although a judicial act was the proper mode of accomplishing the dissolution of a corporation after an act of forfeiture, yet an *ex parte* act, like that of appointing a Receiver, was not such an exercise of judicial authority as could accomplish that result by binding the parties to an actual determination of the facts. This reasoning would exclude an executive act from having any such effect. It will be observed that the two cases have an aspect in

common that was the subject of comment in *Ahrens* vs. *The State Bank*. In both cases the act looking to forfeiture was to be performed on the authority of a statement made by the Comptroller General. We are clearly of opinion that the proclamation of Governor Orr did not work an actual dissolution, but that the corporation possessed the faculty of suing at the time the law ceased to operate, and the statute from that date commenced to run on the causes of action in suit, and accordingly they were barred. Under this view, that disposes of all questions that are essential to a final disposition of the actions, it will be unnecessary to examine the other questions presented by the brief.

There must be a new trial.

*McIver*, A. J., concurred.